UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

MYRLANDE THOMAS,

    Petitioner,

v.                                                Case No:  2:16-cv-445-FtM-38MRM

JEAN MARCEAU ORION,

    Respondent.
_____/

## OPINION AND ORDER[1]

This matter comes before the Court on the Petitioner, Myrlande Thomas' Verified Petition for the Return of Children to Canada (Doc. #1) filed on June 9, 2016. Respondent Jean Marceau Orion filed his Answer and Affirmative Defenses to the Petition (Doc., #17) on July 13, 2016. A hearing was held before the undersigned on August 30, 2016. At the hearing Thomas was represented by Attorney Brett Barfield, and Respondent, Jean Orion was represented by Attorney James Oliver. A Creole French interpreter was provided for Thomas. After the hearing, each Party filed their Findings of Fact and Conclusions of Law. The matter is now fully briefed and ripe for the Court's determination.

Thomas filed her Petition against Jean Marceau Orion on June 9, 2016, pursuant to The Hague Convention on the Civil Aspects of International Child Abduction, October 25, 1980 ("Hague Convention" or "Convention"), T.I.A.S. No. 11,670, 1343 U.N.T.S. 89,

---

[1] Disclaimer:  Documents filed in CM/ECF may contain hyperlinks to other documents or websites.  These hyperlinks are provided only for users' convenience.  Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees.  By allowing hyperlinks to other websites, this Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their websites.  Likewise, the Court has no agreements with any of these third parties or their websites.  The Court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

*reprinted in* 51 Fed. Reg. 10494 (March 26, 1986), and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, *et seq*. Thomas seeks the prompt return to Canada of the Parties' three children, JMO, who is 12 years old and was born in 2004 in Miami, Florida; SRO who is 10 years old and was born in 2005 in Fort Myers, Florida; and MWO who is 9 years old and was born in 2007 in Fort Myers, Florida (collectively, the Children). Tr. at 20:7-23. Thomas alleges Orion wrongfully retained the Children in Lehigh Acres, Florida.

## BACKGROUND

Thomas is a citizen of Haiti and is currently a permanent resident of Canada. In 2008, Thomas was incarcerated in the United States as a result of her status as an illegal alien. In an agreement to voluntarily leave the United States to avoid removal proceedings, the immigration authorities provided Thomas with a one way ticket from Miami, Florida to Haiti. However, instead of returning to Haiti, Thomas took the Children and drove to Canada where they remained prior to coming to the United States to visit their father in 2015. Additionally, Thomas has a seventeen year old son, DD, who lived with Thomas and the Children in Canada.

Orion came to the United States from Haiti and is now a naturalized U.S. citizen. All three of the Children at issue in this petition were born in the United States and are U.S. citizens. Although Thomas and Orion attempted to maintain a long distance relationship for a period of time after she took the children to Canada, they eventually separated in 2009.

Since moving to Canada, Thomas has had numerous investigations regarding the Children by Canadian Child Services (DPG). In 2008 or 2009 her oldest son, DD, told his

teachers at school that Thomas had put socks in his mouth as punishment. Thomas denied the allegations.

In 2011, investigators from DPG again visited Thomas' apartment after one of the Children, SRO, repeatedly called the 911 emergency services number.  Upon arrival, DPG found the apartment a mess with boxes and dirt everywhere. Thomas told DPG the apartment was such a mess because she was preparing to move. DPG filed a Closure Report on August 31, 2016, which contained additional information from investigative visits to Thomas' residence on August 8, 2011, and March 13, 2014. The following information was set forth in DPG's Closure Report:

> The children were left alone, without supervision, when a toddler found himself on the balcony of the apartment situated on the fourth floor of the building. A call to 911 was made, but nobody answered.
>
> The residence was very dirty and unsanitary. The walls were covered with stains and food. The floors were black with grease and dirt. There was dried food on the floor. In addition, there was a strong odor of urine inside the residence, particularly in the bedroom where there was a bunk-bed. Clothing was scattered everywhere in the apartment, or in bags. The kitchen table was buried in a ton of clothing and dirty plates. The kitchen counter was covered with dirty dishes and rotten food. The refrigerator door had been open for some time, for there was no coolness inside, and very little food. It should also be mentioned that water from the kitchen sink was flowing over plates half-covered with food. Little flies were flying about the kitchen, and a rather high temperature was observed inside the house while the temperature was rather cool outside. There was no convenient place to sit in the apartment.
>
> The mother finally arrived at the house, saying that she hadn't been gone for very long but without saying where she had been. The mother blamed the state of the apartment on the fact that she was by herself taking care of the 4 children and that she was getting ready to move soon.

3

([Doc. #58-2](), p. 6).[2]

In December 2012, Thomas left the Children in Canada while she traveled to Haiti to meet a man she knew only from the internet and telephone. Thomas married the man while in Haiti but never told the Children that she married him and the Children never met him. Thomas testified that she never told her children about the marriage because she did not think it would last because he was not a very good man. A few months after they married, they divorced.

In December 2013, Thomas' youngest son, MWO, told his teachers that he was hungry and did not get enough food to eat at home. He told teachers he only got cereal to eat. Once again, DPG services visited Thomas' home. Thomas testified that DPG visited her home around 9:00 pm and explained MWO's report. DPG searched the pantry but Thomas testified that they left satisfied that there was food in the house for the Children to eat. Thereafter, DPG returned to Thomas' residence two or three more times. DPG also interviewed MWO's teachers and did a follow-up interview with the Children while they were at school.

In December 2013, Thomas began a relationship with Cedric Bonomo. Bonomo moved into the family apartment with Thomas and the Children less than a month later, in January 2014. Thomas subsequently married Bonomo. Thereafter, the Children made allegations that Bonomo abused them by hitting them as well as forcing them to hit each other. Bonomo stayed at home and watched the Children while Thomas was at work. JMO, Thomas' oldest son with Orion, told Thomas that Bonomo pushed his head because

---

[2] The Closure Report was not submitted by the DPG until August 31, 2016, after the date of the hearing in this matter. However, the Court reopened the proceedings and allowed Orion to file the Closure Report on September 26, 2016, ([Doc. #58]()). Accordingly this information may be used by the Court in making its determination.

he did not flush the toilet after using the restroom.    Thomas denied ever seeing marks on the children or witnessing any trouble between Bonomo and the Children.  Once she found out about the physical abuse, Thomas stated that she told Bonomo to stop hitting the Children.  Further, she testified that she informed Bonomo that in Canada and the United States encouraging children to hit other children was not an acceptable form of punishment.

According to Thomas, Bonomo moved out of the apartment on May 31, 2016. Thomas is presently in the process of seeking a divorce and testified that she has no intention of reuniting with Bonomo.  Divorce papers were filed in the Canadian Court in July 2016, subsequent to the instant Hague case being filed.  However, Thomas testified she is in a new relationship with another man, Wilfred Garconville.   Although Garconville does not live in the apartment with Thomas and her son, DD, the lease is in his name and he helps pay the rent.

On June 25, 2015, Orion asked Thomas if the Children could come to Florida for a visit instead of his coming to see them in Canada.  Prior to that time, Orion visited the Children in Canada yearly, in addition to providing funds to support the Children.  Thomas agreed to the visit and on June 28, 2015, the Children accompanied Orion to the United States.  Thomas testified that she and Orion agreed the Children would return to Canada in August 2015. Thomas realized that Orion was not going to return the Children when he sent her photographs of the Children in their new school uniforms and backpacks.[3]

---

[3] Contrary to her testimony presented at the hearing, Thomas testified at her deposition that she knew Orion was not going to return the Children to Canada when he first took them in June 2016. (Doc. #52, p. 99:4-25, 100:1-6).

5

In addition to receiving money from Orion, Thomas worked at a nursing home to support herself and the Children. She also received assistance from the Canadian government. Although the children were no longer living with her in Canada after June 2015, Thomas continued to collect child support payments from the Canadian Government from July 2015 through May 2016. The Canadian Government ceased paying Thomas on June 1, 2016, and has demanded that she repay almost $17,000 in funds she fraudulently received.

In additional to being a naturalized citizen of the United States, Orion is currently married and living with his wife and the Children in Lehigh Acres, Florida. The Children are currently enrolled in the Lee County School System and do not wish to be returned to Canada. Orion asserts he kept the Children in Florida because of the DPG report from 2013 and the statements made by the Children that they were physically abused. He also had concerns about the comments made by MWO that he sometimes went hungry.

On September 17, 2015, Thomas filed an Application for Return of the Children with the Central Canadian Authority under the Hague Convention. The Appeal was transmitted to the U.S. State Department under same. The U.S. State Department helped Thomas find counsel to represent her in the matter. On December 4, 2015, the U.S. State Department sent a letter to Orion requesting that he return the Children to Canada. Orion did not comply. On February 11, 2016, the U.S. State Department advised the Judge in the Florida state court paternity and custody proceeding filed by Orion of the application for the return of the Children. The Florida state court was advised that pursuant to Article 16 of the Hague Convention, they could not rule on the merits of the custody claim until the Hague Convention request for the return of the Children to Canada had been

resolved. On June 9, 2016, Thomas filed her verified Petition for the return of the Children with this Court.

## DISCUSSION

Thomas argues the Children's habitual place of residence is in Canada and the Children must be returned to her under the Hague Convention and the International Child Abduction Remedies Act. Conversely, Orion argues the Children are citizens of the United States and are entitled to the full protection of the United States Constitution. He maintains that returning the Children to Canada against their will would be a denial of their Constitutional rights to life, liberty, and property in violation of the Fifth and Fourteenth Amendments. Orion argues that since the Children are citizens of the United States they should not be compelled—against their collective will—to be returned to Canada, which would be a violation of the due process clause.

"The [Hague] Convention was adopted in 1980 in response to the problem of international child abductions during domestic disputes." *De La Riva v. Soto*, No. 215CV615FTM29MRM, 2016 WL 1696539, at *1–3 (M.D. Fla. Apr. 28, 2016) (citing *Abbott v. Abbott*, 560 U.S. 1, 8, 130 S. Ct. 1983, 176 L. Ed. 2d 789 (2010)). The United States became a signatory to the Convention that same year. *Soto*, 2016 WL 1696539, at *1–3 (citing *Baran v. Beaty*, 526 F.3d 1340, 1344 (11th Cir.2008)). In 1988, Congress ensured the Hague Convention's provisions would be implemented in the United States by passing the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 9001 et seq. (formerly cited as 42 U.S.C. § 11601 et seq.). ICARA recognizes that "international abduction or wrongful retention of children is harmful to their well-being," and emphasizes that the only effective way to combat the increasing number of international abductions is

to have "concerted cooperation pursuant to an international agreement." 42 U.S.C. §§ 9001(a)(1), (3).

Together, the Hague Convention and ICARA are "intend[ed] to restore the pre-abduction status quo and deter parents from crossing borders in search of a more sympathetic court for custody hearings." *Soto*, 2016 WL 1696539, at *1–3 (quoting *Hanley v. Roy*, 485 F.3d 641, 644 (11th Cir.2007) (citations omitted)). To that end, their "central feature ... is the return remedy by which a wrongfully removed [or retained] child is to be repatriated to [his or] her home country for custody determinations." *Soto*, 2016 WL 1696539, at *1–3 (citing *Gomez v. Fuenmayor*, 812 F.3d 1005, 1011 (11th Cir.2016)). Consistent therewith, courts evaluating Hague Petitions "ha[ve] jurisdiction to decide the merits only of the wrongful removal [or retention] claim, not of any underlying custody dispute." *Soto*, 2016 WL 1696539, at *1–3 (citing *Lops v. Lops*, 140 F.3d 927, 936 (11th Cir.1998) (citations omitted)).

The Hague Convention was designed to ensure the prompt return of children who have been wrongfully removed or retained; however, the Court may not order a child returned without first determining if the child's removal was wrongful. *Soto*, 2016 WL 1696539, at *2.  This case involves a claim of wrongful retention only, not of wrongful removal. Not every instance in which one parent refuses to return a child is a "wrongful retention" under the Hague Convention. To establish a *prima facie* case of wrongful retention, a petitioner must carry a two-step burden. First, to establish that a "retention" has occurred, the petitioner must show that the child has been kept outside his or her country of "habitual residence." *Soto*, 2016 WL 1696539, at *1–3 (*Pielage v. McConnell*, 516 F.3d 1282, 1288–89 (11th Cir.2008)). Second, for that retention to be "wrongful," it

8

must violate the "rights of custody" afforded the petitioner under the laws of the child's pre-retention country of habitual residence, Hague Convention art. 3(a), which rights the petitioner was "actually exercis[ing]" at the time of the retention or "would have been so exercis[ing] but for the removal or retention." *Soto*, 2016 WL 1696539, at *1–3 (citing Hague Convention art. 3(b)). Once a petitioner meets the burden of establishing these three "wrongful retention" elements by a preponderance of the evidence, the court typically "shall order the return of the child forthwith." *Soto*, 2016 WL 1696539, at *1–3 (citing Hague Convention art. 12; see also 22 U.S.C. § 9001(a)(4); *Lozano v. Montoya Alvarez*, ––– U.S. ––––, 134 S.Ct. 1224, 1234, 188 L.Ed.2d 200 (2014); *Baran*, 526 F.3d at 1345.00

Here, then, Thomas must prove by a preponderance of the evidence that: (1) the Children were habitual residents of Canada immediately before Orion's refusal to return them; (2) the retention breaches Thomas' custody rights under Canadian law; and (3) Thomas was exercising custody rights at the time of the retention. *Chafin v. Chafin*, 742 F.3d 934, 938 (11th Cir.2013). The Court will discuss each requirement in turn.

(1) *Whether Canada was the Children's Habitual Place of Residence*

The testimony presented at the hearing established that since July 2008 the Children attended school, went to church, and lived with Thomas in Canada. Orion sent child support payments to Thomas in Canada and traveled to Canada to visit with the Children on a yearly basis. The Children had not returned to the United States between 2008 and June 2015. In fact, there was an agreed upon date—August 2015—for the Children to return to Canada. See *Soto*, 2016 WL 1696539, at *6 (holding that where the parties have previously agreed that the child would be returned on or by a fixed date, and

that date passes without the child's return, courts typically find the agreed-upon date to be the relevant one for determining the child's place of habitual residence). Therefore, the Court finds by a preponderance of the evidence the Children were habitual residents of Canada at the time they came to Florida and Orion retained them past the agreed upon date of return.

(2) *Whether the Retention was Wrongful*

Having determined the Children were retained by Orion in Florida past the time he was scheduled to return them to Canada, the Court must now determine if the retention was wrongful. To establish a prima facie case that a child should be returned where a wrongful retention is alleged, a petitioner must first prove that the child is being kept *outside* of his country of habitual residence (the "retention" aspect). *Pielage v. McConnell*, 516 F.3d 182,1287–89 (11th Cir. 2008). The petitioner must then show that, at the time of the retention, (i) she had custody rights over the child under the laws of the child's country of habitual residence that (ii) were breached by the retention, and (iii) which were actually being exercised at the time of the retention (together, the "wrongful" aspect). *Id.* at 1288.

*(a) Custody Rights*

Thomas contends that she possessed custody rights under the laws of Canada. There was no prior judicial determination, nor any formal custody agreement presented to the Court as evidence of which parent had custody of the Children. However, Thomas provided the Declaration of Daniele Barbiero, her Qubec attorney, supporting her claim that she maintained custody of the Children under Canadian law. Atty. Barbiero stated that pursuant to the Civil Code of Quebec (CCQ) that Thomas had the following rights:

> Article 599 provides: "The father and mother have the rights and duties of custody, supervision and education of their children. They shall maintain their children."
>
> Article 600 provides: "The father and mother exercise parental authority together. If either parent dies, is deprived of parental authority or is unable to express his or her will, parental authority is exercised by the other parent."
>
> Article 601 provides: "The person having parental authority may delegate the custody, supervision or education of the child."
>
> Article 3141 provides: "Quebec authorities have jurisdiction to hear personal actions of an extrapatriamonial and family nature when one of the persons concerned is domiciled in Quebec."
>
> Article 3142 provides: "Quebec authorities have jurisdiction to decide as to the custody of a child provided he is domiciled in Quebec."

(Joint Ex. 10).

Atty. Barbiero declared that Thomas had all of the above listed rights of custody under the CCQ from 2008 up until at least June 2015, when the Children went to visit their father in Florida. (Joint Ex. 10). Under the terms of the Hague Convention, even a single joint custody right can establish rights of custody. *See Furnes v Reeves*, 362 F. 3d 702, 721-22 (11th Cir. 2004) abrogated on other grounds by *Lozani v Alverez*, 134 S. Ct. 1224, 188 L. Ed. 2d 200 (2014) (holding that the Hague Convention requires the return of the child to the parent who possess a single right of custody—even a joint right—that is violated by the child's removal).

Under Article 599 of the CCQ maintaining your children, supervising and seeing to their education is a joint right of custody. Here, based upon the custody rights as listed in the CCQ, Thomas had custody rights over the Children under the laws of Canada

11

because she was responsible for maintaining the Children, providing for their education as well as providing for their food and housing.

### (b) *Whether Thomas's Custody Rights were Breached by the Retention*

Pursuant to the CCQ Thomas had the rights and duties of custody, supervision and education over the Children. She prepared them and got them off to school, she had them attend church, and was responsible for feeding, and housing them. Once Orion kept the Children in Florida she was denied those custody rights. Thus, the Court finds Orion's retention of the Children breached Thomas' custody rights.

### (c) *Whether Thomas was Exercising Her Custody Rights at the Time of Retention*

Thomas avers that she was exercising her custody rights at the time of Orion's wrongful retention. Although the Hague Convention and ICARA do not specify what constitutes an "exercise" of custody rights, courts in the M.D. Florida have reasoned that "the only acceptable solution, in the absence of a ruling from a court in the country of habitual residence, is to liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *Soto*, 2016 WL 1696539, at *11 (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1065 (6th Cir.1996)). Further, "if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Soto*, 2016 WL 1696539, at *11 (quoting *Friedrich*, 78 F.3d at 1066)).

At the time of Orion's retention, Thomas was providing for the Children's housing, education, and food. Therefore, given the liberal standard under the Hague Convention,

the Court determines that Thomas was exercising her custody rights up to the time the Children were retained in Florida.

Thus, the Court concludes that Thomas has established by a preponderance of the evidence that: (1) The Children were habitual residents of Canada immediately before Orion's refusal to return them to Thomas; (2) the retention breached her custody rights under Canadian law; and (3) Thomas was exercising those custody rights at the time of the retention. Based upon those findings, the Children should be returned to Canada. There are, however, several exceptions to the rule that a wrongfully removed or retained child must be returned to his or her place of habitual residence. *Soto,* 2016 WL 1696539, at *1–3. Therefore, the Court must first see if one of the exceptions apply to the facts of this case before ordering the Children returned to Thomas in Canada.

### (3) *Whether an Exception to the Hague Convention Exists*

Orion argues the Children should not be returned to Canada because they would be exposed to grave risk of physical or psychological harm or otherwise place them in an intolerable situation. Further, the Children have stated they do not wish to return to Canada. Thomas argues the facts of this case fall short of establishing the Children would be exposed to grave risk of physical or psychological harm under Article 13(b) of the Hague Convention.

A court is not bound to order the return of a child if the respondent demonstrates by a preponderance of the evidence that: the person having care of the child "had consented to or subsequently acquiesced in the removal or retention," Hague Convention art. 13(a); "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views," id. Art. 13; or the

13

proceedings seeking the child's return were commenced more than one year after the date of the wrongful removal or retention and "it is determined that the child is now settled in its new environment." *Soto*, 2016 WL 1696539, at *1–3 (citing Hague Convention art. 12). Neither must the court return a child where the respondent shows by clear and convincing evidence that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," *Id.* art. 13(b), or that returning the child "would not be permitted by fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." *Id.* art. 20.

The Eleventh Circuit has emphasized that "narrow interpretations of these exceptions are necessary to prevent them from swallowing the rule and rendering the Convention a dead letter." *Soto*, 2016 WL 1696539, at *1–3 (citing *Gomez*, 812 F.3d at 1011 (citation omitted)). Even when the respondent establishes one or more exceptions, the Court may still order the return of a child. Id. art. 18; see also *Soto*, 2016 WL 1696539, at *1–3; *Lozano*, 134 S. Ct. at 1237 (Alito, J., concurring); *Baran*, 526 F.3d at 1345. In other words, a district court has considerable discretion in deciding whether a wrongfully-retained child should be returned. *Soto*, 2016 WL 1696539, at *1–3.

### (a) <u>Whether the Children are of Age</u>

Orion argues the Children are of an age and maturity under Article 13 of the Convention that their wishes concerning whether to return to Canada should be taken into account. He further states the Children unanimously object to being sent back to Canada and that their objections should be given full weight and consideration.

A court is not bound to order the return of a child if respondent demonstrates by a preponderance of the evidence that "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." *In re S.L.C.*, 4 F. Supp. 3d 1338, 1349 (M.D. Fla. 2014) (quoting Hague Convention, art. 13; 42 U.S.C. § 11603(e)(2)(A) transferred to 22 U.S.C. § 9003(e)). This provides a separate and independent basis for a court to refuse to return a child to the country of habitual residency, *Blondin v. Dubois,* 238 F.3d, 153, 166 (2d Cir.2001), although like other exceptions it is narrowly applied. *In re S.L.C.*, 4 F. Supp. 3d at 1349.

Under Article 13 of the Hague Convention and ICARA, Orion must prove the Children consented to stay in the United States by a preponderance of the evidence. 42 U.S.C. § 11603(e)(2) transferred to 22 U.S.C. § 9003. In this instance, Orion has offered no proof other than his own statement that the Children wish to stay in the United States. Although it is not difficult to assume that the children, after living with their father and his wife in Lehigh Acres in a nurturing environment, would not want to return to Canada, the Children are twelve, ten and nine years old respectively and have not reached the age nor maturity necessary to make a decision on which parent and or country in which to reside. *See In re S.L.C.*, 4 F. Supp. 3d at 1349 (finding that a twelve year old child was not old enough to determine what country he should live in). Accordingly, Orion's consent argument here does not carry the day.

### (b) *Whether the Children's Constitution Rights would be Violated*

Orion also argues the Childrens' Constitutional Right to due process would be violated if they were sent back to Canada because they are American citizens. The Children are given a hearing and allowed due process of law in accord with the Hague

15

Treaty and federal law under ICARA. While Orion cites to Florida law arguing it establishes safeguards to ensure that children are given fair hearings in Florida courts, the Hague Convention and ICARA also provide due process for the Children. Accordingly, Orion's argument that the Childrens' due process rights are being violated is not well taken.

*(c) Whether the Children would be Exposed to Physical or Psychological Harm*

The Court finds the argument regarding the children being exposed to grave risk of physical or psychological harm compelling. Evidence presented at the hearing establishes that returning the Children to Canada and Thomas would expose them to grave physical or psychological harm. The last report submitted by DPG establishes the Childrens' living conditions were deplorable. The floors were filthy, dried food stuck to the walls, the refrigerator door was open to the point the inside was no longer cool, and there was very little food inside. (Ex. 10). MWO, reported that he was hungry at school because he did not get any breakfast and noted that he only had cereal for supper the night before. The other Children supported MWO's statements.

MWO was physically hit by his oldest half-brother, DD, a fact confirmed by Thomas who said DD sometimes watched the children and they had to learn to respect him. MWO also reported that Thomas hit him with a hair brush on his hand and back.

Thomas admitted that her estranged husband Bonomo also hit the Children. The Children reported that Bonomo would sometimes have the oldest child, JMO, and/or DD hit the younger children while he watched. In 2008, DD reported to school authorities that Thomas stuffed socks into his mouth as a form of punishment. Further, Thomas admitted instructing the Children to keep quiet and not to report any physical abuse they received

or any meals they missed. This strongly indicates Thomas was attempting to hide the abuse from Canadian authorities.

While Thomas could argue that she is divorcing Bonomo and, thus, removing the danger, she has shown a proclivity to enter into abusive relationships with men. Notably, before she married Bonomo, she left the Children in Canada for a month while she traveled to Haiti. While there, Thomas married a man she had only talked to on the telephone and via the internet. She never told the Children that she was married and testified that the marriage ended after a few months because he was not a very good man. Thomas also testified that she did not inquire of Bonomo about any alleged abuse of the Children because in Haitian culture women do not question their husband's actions. Moreover, Thomas recently lost a baby that was fathered by yet another man and is currently living in an apartment leased by a third man who she now claims as her current boyfriend.

Given the abuse suffered by the Children at the hands of Thomas and Bonomo, the lack of food, the uncleanliness of the living environment, and Thomas' proclivity to attach herself to men she does not know well, the Court finds by clear and convincing evidence there is a grave risk of physical or psychological harm that would be caused by returning the Children to Canada.

## **CONCLUSION**

Based upon the Parties memoranda of law, the evidence and testimony presented at the hearing, and the record before the Court, the Court finds that Canada was the habitual place of residence for the Children, that Thomas had custody of the Children under Canadian law, and that the retention of the Children in Florida violated her custody

rights. Nevertheless, the Court finds that to return the Children to Canada at this time would expose them to a grave risk of physical or psychological harm or otherwise place the Children in an intolerable situation. Therefore, the Petition to return the Children will be denied and the Children are to remain in the United States until the Florida courts resolve the issue of custody.

Accordingly, it is now

**ORDERED:**

Petitioner, Myrlande Thomas' Verified Petition for the Return of Children to Canada (Doc. #1) is **DENIED**.

(1) The Children are to remain in the United States pending custody proceedings in the Florida Courts.

(2) The Clerk is directed to enter judgment accordingly, terminate any pending motions, and close the file.

**DONE** and **ORDERED** in Fort Myers, Florida this 5th day of December, 2016.

*Sheri Polster Chappell*
SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: All Parties of Record